[Cite as *State v. Graham*, 2016-Ohio-3210.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 14CA0084-M |
| | |
| Appellee | |
| | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| | COURT OF COMMON PLEAS |
| HEATHER GRAHAM | COUNTY OF MEDINA, OHIO |
| | CASE No. 13CR0748 |
| Appellant | |

DECISION AND JOURNAL ENTRY

Dated: May 31, 2016

SCHAFER, Judge.

{¶1} Defendant-Appellant, Heather Graham, appeals from the judgment of the Medina County Court of Common Pleas convicting her of multiple drug-related offenses. For the reasons set forth below, we affirm.

I.

{¶2} Graham moved to Medina, Ohio from Washington, D.C. at some point in 2013. Graham was a heroin user and occasionally attended Narcotics Anonymous meetings in Medina. Graham met and befriended B.J., a 17-year-old girl, at one such meeting.

{¶3} On May 29, 2013, Graham texted B.J. asking if she wanted to hang out and get something to eat. B.J. replied yes. Graham then rented a car from Hertz and picked B.J. up from a local hair salon at around 1:00 p.m. Graham and B.J. then picked up Jason Gangle, one of B.J.'s friends and a known drug supplier, from an apartment complex in Medina. The three of them proceeded to drive to Cleveland to purchase heroin from one of Gangle's drug contacts.

{¶4} Upon arriving in Cleveland, Graham purchased a gram and a half of heroin for $220.00 from Gangle's contact. The three of them then drove to a nearby gas station, where Graham and Gangle both shot up some of the heroin, leaving a little bit over a gram for future use. B.J. did not partake in any drug use at this time. Because Gangle and Graham were both high from the heroin, B.J. drove everybody back to Medina. B.J. dropped Gangle off at his apartment and left with Graham.

{¶5} Graham and B.J. made their way to Walmart around 4:30 p.m. While at Walmart, B.J. and Graham ran into B.J.'s grandmother, Rita Miktuk, who was there shopping. Miktuk observed that Graham appeared as if she were suffering from terrible allergies because Graham's eyes were unfocused and were noticeably red in color. Later that night, B.J.'s mother, Darlene, called B.J. at around 8:30 p.m. B.J. told her mother that she was going to the mall with Graham and would be home by curfew. At around 10:45 p.m., Graham and B.J. returned the rental car to Hertz and called for a taxi to take them to their respective homes. The taxi driver, Kenneth Kirstein, recognized B.J. from Narcotics Anonymous meetings. Kirstein testified that he dropped B.J. off at her home around 11:30 p.m. However, Kirstein was asked to wait outside in the taxi for about 10 to 15 minutes before driving Graham home because the girls needed to go inside to "split up their purchases" from Walmart. Graham eventually returned to the taxi and was driven home.

{¶6} At 5:00 a.m. the following morning, B.J.'s mother awoke to get ready for work. She observed that B.J.'s bedroom door was open with the lights on, which she thought was unusual. Upon entering B.J.'s bedroom, Darlene discovered B.J. unconscious on her bed and blue in the face. Paramedics were immediately summoned and B.J. was transported to the hospital, where she was pronounced dead. Suspecting that B.J. had overdosed on drugs, the

police searched B.J.'s bedroom and the entire house, but discovered no trace of drugs or drug paraphernalia. The police also searched B.J.'s phone wherein they discovered a number of recent text messages from Graham referencing drugs. The cause of B.J.'s death was later confirmed to be the result of a heroin overdose. The police contacted Graham and spoke with her about the events leading up to B.J.'s death.

{¶7} The Medina County Grand Jury indicted Graham on: (1) one count of corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a), a second-degree felony; (2) one count of complicity to commit trafficking in heroin in violation of R.C. 2923.03(A)(2), 2925.03(A)(2), a fifth-degree felony; and (3) one count of conspiracy to commit trafficking in heroin in violation of R.C. 2923.01(A)(1), 2925.03(A)(2), a first-degree misdemeanor. The matter proceeded to a bench trial. At the close of the State's case-in-chief, Graham made a general motion for judgment of acquittal pursuant to Crim.R. 29, which the trial court denied. At the close of all evidence, the trial court took the matter under advisement and ultimately found Graham guilty of all counts within the indictment. The trial court sentenced Graham to a three-year term of imprisonment.

{¶8} Graham filed a timely appeal, presenting one assignment of error for our review.

II.

**Assignment of Error**

**The evidence was insufficient to support the trial court's verdict of "guilty" as to all three counts of the indictment, and the defendant's convictions as to all three counts were against the manifest weight of the evidence.**

{¶9} In her sole assignment of error, Graham argues that her judgment of conviction on all three counts in the indictment was unsupported by both sufficient evidence and the manifest weight of the evidence. We disagree.

## A. Standard of Review

{¶10} "'We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence.'" *State v. Smith*, 9th Dist. Summit No. 27389, 2015-Ohio-2842, ¶ 17, quoting *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the prosecution, we must decide whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* Although we conduct de novo review when considering a sufficiency of the evidence challenge, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570, C-120751, 2013-Ohio-4775, ¶ 33.

{¶11} A sufficiency challenge is legally distinct from a manifest weight challenge. *Thompkins* at 387. Accordingly, when applying the manifest weight standard, we are required to consider the whole record, "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson,* 9th Dist. Summit No. 26900, 2013–Ohio–5785,

¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction," *Thompkins* at 387.

**{¶12}** This matter implicates Graham's convictions for corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a), complicity to commit trafficking in heroin in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(2), and conspiracy to commit trafficking in heroin in violation of R.C. 2923.01(A)(1) and R.C. 2925.03(A)(2). We address each offense in turn.

### B. Corrupting Another With Drugs Conviction

**{¶13}** R.C. 2925.02(A)(4)(a) pertinently provides that "[n]o person shall knowingly * * * [b]y any means, * * * [fu]rnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B). Former R.C. 2901.22(C) stated that "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."[1] Pursuant to R.C. 2925.01(A), a controlled substance for the purposes of R.C. 2925.02 is defined as "a drug, compound, mixture, preparation or substance included in schedule I, II, III, IV or V." R.C. 3719.01(C). Heroin is a schedule I drug. R.C. 3719.41(B)(11).

---

[1] 2014 Am.S.B. No. 361, effective March 23, 2015, amended R.C. 2901.21's language regarding statutes without a listed mental state and R.C. 2901.22's definition of mental states. Since the charged offenses in this matter occurred before Am.S.B. 361's effective date, we rely on the previous versions of the statutory language.

{¶14} Graham challenges her corrupting another with drugs convictions on two grounds: (1) that the State failed to offer sufficient evidence to prove that Graham knew that B.J. was a juvenile, or was reckless in that regard; and (2) that the State presented insufficient evidence to prove beyond a reasonable doubt that Graham "knowingly furnished or administered" heroin to B.J.  As to Graham's state of mind toward B.J.'s age, a review of the record reveals a number of factors that, when viewed in the aggregate, lead us to reach the conclusion that the State met its burden of proof.  First, Officer Josh Grusendorf of the Medina Police Department testified that he met and spoke with Graham on multiple occasions following B.J.'s death.  Officer Grusendorf testified that Graham told him that she first met B.J. at a Narcotics Anonymous meeting in Medina.  Graham also told Officer Grusendorf that she was aware that several attendees of the Narcotics Anonymous meetings in Medina were very young, including some who were still in middle school.  Additionally, Officer Grusendorf testified that he searched B.J.'s phone as part of his investigation into B.J.'s death and that he discovered a text message from May 28, 2013 where Graham asked B.J. if she still attended school.  B.J. replied back that she had already graduated and no longer attended school.

{¶15} Secondly, B.J.'s grandmother, Rita Miktuk, testified that she ran into B.J. and Graham at Walmart on May 29. 2013 at roughly 4:30 p.m.  Miktuk testified that Graham commented on her youthful appearance after she was introduced as B.J.'s grandmother.  Specifically, Graham told Miktuk that she appeared as if she was only 40 years old.  Miktuk responded by telling Graham her actual age and the age of her daughter, who is B.J.'s mother.  From this information, we determine that it was reasonable for the trier of fact to infer that Graham could reasonably deduce B.J.'s age range.

{¶16} Lastly, Officer Grusendorf testified that B.J. sent Graham a text message at 11:26 p.m. on the night of May 29, 2013. Officer Grusendorf testified that this text was sent while Graham and B.J. were riding home in the taxi. The text message that B.J. sent to Graham reads, "Can u give me some s[---]? I'll give u money tomorrow." Graham then responded, "How do you expect me to do that? You want me to pull it out in front of [the taxi driver]?" Officer Grusendorf testified that when he asked Graham about this specific text message, Graham contended that B.J. was referring to cigarettes, not heroin. As cigarettes are not illegal for individuals over the age of 18, *see* R.C. 2151.87; R.C. 2927.02, Graham's reply to B.J.'s text message indicating reluctance to provide B.J. with "some s[---]" in the presence of the taxi driver denotes Graham's knowledge that B.J. was under the age of 18. We conclude that this evidence, when viewed together, was sufficient to prove that Graham was at least reckless with regard to knowing B.J.'s true age.

{¶17} With regard to whether Graham "knowingly furnished or administered" heroin to B.J., we again determine that the State presented sufficient evidence on this point. Gangle testified at trial that he, Graham, and B.J. all drove to Cleveland on May 29, 2013 in order to buy heroin from his contact, which they did. Gangle also testified that Graham paid for the heroin and that he and Graham then shot up heroin at a nearby gas station. Gangle stated that B.J. did not partake in shooting up heroin while they were together in Cleveland. Gangle further testified that B.J. drove everybody back to Medina because she was the only person sober enough to do so. Miktuk testified that when she encountered Graham and B.J. at Walmart, Graham's eyes appeared to be unfocused and red, whereas B.J. did not appear to be high. The taxi driver who drove Graham and B.J. home around 11:15 p.m. testified that neither girl appeared to be under the influence of drugs.

{¶18} Moreover, Officer Grusendorf testified that while the girls were being driven home in the taxi, B.J. texted Graham asking her to provide her with "some s[---]," which, in context, Officer Grusendorf understood to mean heroin. Officer Grusendorf further testified that Graham's text message reply to B.J. showed Graham was reluctant to provide B.J. with "some s[---]" in front of the taxi driver. The taxi driver testified that when he dropped B.J. off at her home, B.J. and Graham went around the corner of the house and out of his sight for roughly 10 to 15 minutes in order to "split up their purchases from the store." That was the last time anybody other than Graham saw B.J. alive, as she was discovered lifeless at 5:00 a.m. in her bedroom the following morning. Both Officer Grusendorf and Officer Matthew Martinain of the Medina Police Department testified that they searched B.J.'s bedroom on the day of B.J.'s death and discovered no trace of drugs or drug paraphernalia.

{¶19} After a thorough review of the record, we determine that Gangle, Miktuk, and the taxi driver's testimony, when taken together, establish a timeline showing that B.J. had not taken drugs and was not under the influence prior to 11:15 p.m. Additionally, Officer Grusendorf's testimony regarding B.J.'s text message to Graham wherein B.J. asked for "some s[---]" in exchange for future payment establishes that B.J. wanted heroin and knew she could procure it from Graham. It was reasonable for the trier of fact to infer from Graham's response to B.J.'s text message that Graham not only had heroin on her person, but that she was willing to provide B.J. with heroin once they were out of the taxi driver's presence. Lastly, from the taxi driver's testimony that Graham and B.J. left his presence for 10 to 15 minutes, one could reasonably infer that Graham was either "furnish[ing] or administer[ing]" heroin to B.J. during this time slot, especially since B.J. was found dead roughly five hours later with no trace of drug paraphernalia

present in her bedroom or house. Thus, we determine that the trial court did not err in denying Graham's Crim.R. 29 motion on the corrupting another with drugs offense.

{¶20} Graham further contends that this conviction was against the manifest weight of the evidence. Specifically, Graham argues that she assumed that B.J. was over the age of 18 based upon B.J.'s appearance and the text message she received from B.J. stating that she had graduated from school. However, the trial judge, sitting as the trier of fact in this matter, apparently accepted the State's theory, which was predicated upon the testimony of Officer Grusendorf and Rita Miktuk, that Graham either knew B.J.'s actual age, or was reckless in that regard. The testimony of the State's witnesses, if believed, would support the conclusion that Graham at the very least was reckless with regard to B.J.'s true age.

{¶21} Additionally, Graham argues that Gangle's testimony was contradictory and thus not credible, especially considering the fact that he avoided the authorities in the wake of B.J.'s death. Rather, Graham argues that she was more credible, especially considering the fact that she fully cooperated with law enforcement following B.J.'s death, that her statements to the police regarding her activities on May 29, 2013 were verified, that a drug test administered on May 30, 2013 came back negative for heroin, and because she is a decorated military veteran.

{¶22} However, after a thorough review of the record, we cannot say that this is the exceptional case where the evidence weighs heavily against conviction. Although there were discrepancies in Gangle's testimony, the trier of fact "'is free to believe all, part, or none of the testimony of each witness.'" *State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. Furthermore, a verdict is not against the manifest weight of the evidence merely because the trier of fact found the State's witnesses to be credible. *State v. Andrews*, 9th Dist. Summit No. 25114,

2010-Ohio-6126, ¶ 28. Under these circumstances, where there was testimony that Graham purchased heroin and that B.J. later asked Graham to sell her "some s[---]" in a text message just hours before her death, we cannot say that the trier of fact clearly lost its way in convicting Graham of corrupting another with drugs.

### C. Conspiracy and Complicity Convictions

{¶23} Graham challenges her complicity and conspiracy convictions solely on the grounds that the State failed to present sufficient evidence that she provided Graham with heroin. As such, we decline to address the elements of the respective offenses that do not pertain to Graham's argument.

{¶24} R.C. 2925.03(A)(2) provides in pertinent part that "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person." R.C. 2923.01(A)(1), Ohio's conspiracy statute, relevantly states that "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * a felony drug trafficking * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of any of the specified offenses[.]"

{¶25} "Once the actual commission of the offense at issue occurs, the crime of complicity arises." *State v. Hoang*, 9th Dist. Medina No. 09CA0061-M, 2010–Ohio–6054, ¶ 9. The complicity statute provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A)(2).

{¶26} "To support a conviction for complicity by aiding and abetting, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson,* 93 Ohio St.3d 240 (2001), syllabus. Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent "may be inferred from presence, companionship, and conduct before and after the offense is committed." *State v. Lett,* 160 Ohio App.3d 46, 2005–Ohio–1308, ¶ 29 (8th Dist.). "Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout." *Id*. However, "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). "[T]here must be some level of active participation by way of providing assistance or encouragement." *State v. Nievas*, 121 Ohio App.3d 451, 456 (8th Dist.1997). "'Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act.'" *Id*., quoting *State v. Sims*, 10 Ohio App.3d 56, 59 (8th Dist.1983).

{¶27} Graham challenges her conspiracy and complicity convictions on the basis that the State offered insufficient evidence to show that she "purposely planned or aided in planning" a heroin trafficking offense, or "knowingly aided and abetted another in committing" a trafficking in heroin offense. Specifically, the crux of Graham's argument as it relates to both the conspiracy and the complicity convictions is that the State failed to prove that Graham provided B.J. with heroin. However, for the same reasons set forth in our analysis above, we

determine that the State presented sufficient evidence to support both the conspiracy and complicity convictions.

{¶28} Again, Gangle, Miktuk, and the taxi driver's testimony, when taken together, established a timeline that, if accepted by the trier of fact, demonstrate that B.J. had not taken drugs and was not under the influence prior to 11:15 p.m. Moreover, Officer Grusendorf's testimony regarding B.J.'s text message conversation with Graham on the night of May 29, 2013 illustrates that B.J. wanted Graham to sell her heroin and that Graham showed a willingness to give B.J. some heroin once they were outside of the taxi driver's presence. The taxi driver testified that Graham and B.J. left his presence for roughly 10 to 15 minutes before Graham returned to the taxi and was driven home, thus showing that Graham had the opportunity to provide B.J. with heroin. Lastly, two officers from the Medina Police Department testified that a search of B.J.'s bedroom and of house following B.J.'s overdose revealed no trace of either drugs or drug paraphernalia, which signifies that B.J. used the heroin that caused her overdose prior to entering her house on the night of May 29, 2013. Therefore, we conclude that the trial court did not err in denying Graham's Crim.R. 29 motion on the conspiracy and complicity charges.

{¶29} While Graham additionally argues that her convictions for conspiracy and complicity were against the manifest weight of the evidence, her argument largely mirrors the argument that she made regarding her corrupting another with drugs conviction. As such, for the same reasons articulated above, we determine that Graham's convictions were not against the manifest weight of the evidence, as we cannot say that the trier of fact clearly lost its way in convicting Graham of conspiracy and complicity.

{¶30} Accordingly, Graham's assignment of error is overruled.

III.

**{¶31}** Graham's sole assignment of error is overruled and the judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

JOSEPH F. SALZGEBER, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.